J-A22020-17
J-A22021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

G.N.I.

                                    Appellant

                    v.

C.S.

                                    Appellee

IN THE SUPERIOR COURT
OF
PENNSYLVANIA

No. 581 EDA 2017

Appeal from the Order Entered January 23, 2017
In the Court of Common Pleas of Bucks County
Domestic Relations at No(s): A06-07-62331-C-26

*****

G.N.I.

                                    Appellee

                    v.

C.S.

                                    Appellant

IN THE SUPERIOR COURT
OF
PENNSYLVANIA

No. 977 EDA 2017

Appeal from the Order Entered February 22, 2017
In the Court of Common Pleas of Bucks County
Domestic Relations at No(s): A06-07-62331-C-26

BEFORE:  BOWES, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED OCTOBER 20, 2017**

_____

[*] Retired Senior Judge assigned to the Superior Court.

C.S. ("Mother") and G.N.I. ("Father"), both *pro se*, cross appeal from the February 22, 2017 order,[1] entered in the Court of Common Pleas of Bucks County, denying Father's petition to modify custody and his petition for contempt, ordering the parties to share legal custody of their minor son and minor daughter ("Children"), ages 12 and 14, granting Mother primary physical custody, and granting Father partial physical custody.[2] After our review, we affirm.

This litigation has persisted for over ten years. The parties separated on July 31, 2007; the court entered an initial interim custody order, by agreement, on October 18, 2007. Since then, the parties have inundated the court with over 200 custody docket entries,[3] unwilling to see beyond

---

[1] We note some confusion as to the date the order was entered in this case. The trial court, in its opinion filed April 4, 2017, erroneously finds that Mother's appeal was untimely filed on March 20, 2017. Trial Court Opinion, 4/4/17, at 1. The purported order of January 23, 2017, however, was not entered on the trial court docket until February 22, 2017. *See* Pa.R.A.P. 301(a) ("[N]o order of a court shall be appealable until it has been entered upon the appropriate docket in the lower court."); *see also* Pa.R.C.P. 236. Mother's March 20, 2107 appeal, therefore, was timely filed from the February 22, 2017 order. Father's appeal, filed on February 8, 2017, which was taken prior to entry of the order on the docket and Rule 236 notice, was premature. This, however, is not fatal to his appeal. *See* Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof."). Thus, Father's notice of appeal is treated as filed on February 22, 2017.

[2] We have consolidated Mother's and Father's appeals pursuant to Pa.R.A.P. 513.

[3] *See* Trial Court's Statement on the Record, 1/10/17, at 10.

- 2 -

themselves to grasp the effect this bitterness has on their children. In his July 20, 2015 opinion, following two days of testimony on one of Father's petitions for contempt, the Honorable Alan M. Rubenstein stated: "[The parties] are so full of venom for each other that they forget there's two children here who can't speak for themselves." **See** Trial Court Opinion, 7/20/15, at 4.[4] Unfortunately for Children, the parties continue to ignore the advice and admonitions of the Parent Coordinator, whom they hired, and the three trial court judges who have agonized through this litigation. As Judge Rubenstein stated, the parties are unable to stop focusing on their dislike for one another and instead focus on their children, **see** Trial Court's Statement on the Record, 1/10/17, at 5-6, and as he predicted, Mother and Father have filed appeals from the February 22, 2017 order.

> The order provides, in relevant part:

> Father is to have partial physical custody Thursday after school until Monday morning and Thursday at 4:00 p.m. until Friday morning on alternative weeks. During the summer, the custody schedule will be modified to week-to-week. Mother shall be required to transport the children for all pick-ups and drop-offs, and to deliver the children to Father for his periods of partial custody.

Order, 2/22/17.

---

[4] The level of conflict has not abated. In his Statement on the Record, Judge Rubenstein characterized this "pitched battle" as a "war without end." **Id.** at 68. It is difficult for this Court to fathom how parents can continue behavior that is so destructive and contrary to their children's best interests, bordering on emotional abuse. They are so blinded by hostility toward each other that they are willing to sacrifice their children's well-being.

Mother raises the following claims (verbatim):

1. Did the trial court commit an abuse of discretion or error of law when its decision did not match the evidence, most recent custody evaluation done, Father's recent selected abandonment of Children, and failed to consider the factors of custody based on facts including the need to protect the best interests of the Children and the Children's well-reasoned preference to spend more time with Mother than they currently had?

2. Did the trial court commit an abuse of discretion or error of law based on the judge's bias toward Mother and create an unfair courtroom, including confusing testimony in the verdict and citing things incorrectly versus what the record and evidence showed, as well as whereby [sic] the factors of custody were not fairly applied based on evidence due to the same bias?

   a. Did the trial court commit an abuse of discretion or error of law by ignoring Mother's petitions and concerns shared that Father and Stepmother committed perjury on several instances with no recourse including violating rules of truth in courtroom [sic] and while under oath, and in documents submitted vs. the fabricated one Mother pointed out to the court, Father's petitions submitted with blatant lies whereby Mother's reply petitions showed source documents from third parties to show the facts; additionally Mother's concern with Father and Stepmother knowingly gathering a copy of their sealed custody evaluation all in an attempt to divert this case from the truth?

Mother's Appellant's Brief, at 4-5.

Father raises the following issues:[5]

_____

[5] Father's issues in his Statement of Questions Involved in his appellate brief differ slightly from those raised in his Pa.R.A.P. 1925(b) Statement of Errors Complained of on Appeal. **See** Father's Appellant Brief, at 4-5; Rule 1925(b) Statement, 2/8/17. We have taken his issues on appeal from his Rule 1925(b) Statement, **See** Pa.R.A.P. 1925(b)(4)(vii).

- 4 -

1. Should this Court vacate the lower court's final custody order because it was based on unreasonable conclusions relative to [Children's] need for stability, and therefore does not further the best interests of [Children] because:

   a. The court's most important conclusion relative to Children of sound judgment to provide a well-reasoned preference was not supported by the evidence and was thus not a sustainable finding (children contemplating suicide and expelled from two daycares with continual behavioral problems);

   b. The court's order was unreasonable because it failed to address the fact that [C]hildren are deprived of Father's care for extended periods during the school week due to Mother's created impediment with respect to proximity between homes, and which is particularly problematic in light of the court's simultaneous conclusion that Mother discourages [C]hildren's relationship with their Father and instigates turmoil?

2. The trial court abused its discretion and/or committed an error of law by violating the Fourteenth Amendment (Amendment XIV) of the Constitution of the United States in denying a *pro-se* party from obtaining a copy of the custody evaluation report in upholding a discriminatory policy that only allows lawyers to obtain copies.

3. The trial court abused its discretion and/or committed an error of law in failing to recognize Father's Petition for Special Relief filed on August 10, 2016, which was added to the docket and scheduled for trial on September 23, 2016 at the same time as the custody modification, and which evidence contained within contradicts the findings in the lower court's opinion.

4. The trial court abused its discretion and/or committed an error of law by not adhering to the Rules of Civil Procedure in not promptly disposing of the custody matter.

Father's Rule 1925(b) Statement of Errors Complained of on Appeal, 2/8/17.

In reviewing a custody order, our scope and standard of review are well established.

> [O]ur scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**Collins v. Collins**, 897 A.2d 466, 471 (Pa. Super. 2006) (internal citations and quotation marks omitted).

The paramount concern in any child custody case is the best interests of the child. **See** 23 Pa.C.S.A. §§ 5328, 5338. "This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child." **J.R.M. v. J.E.A.**, 33 A.3d 647, 650 (Pa. Super. 2011) (citation omitted). "A party seeking modification of custody arrangements has the burden to show that modification is in the child's best interest." **Ketterer v. Seifert**, 902 A.2d 533, 539 (Pa. Super. 2006). Additionally, this Court has observed that

> the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Id.** at 540.

The factors to be considered by the court when awarding custody are set forth in 23 Pa.C.S.A. § 5328(a). Section 5328(a) provides:

**§ 5328.  Factors to consider when awarding custody.**

(a)  Factors. – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

  (1)  Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

  (2)  The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

  (2.1) Consideration of child abuse and involvement with child protective services.

  (3)  The parental duties performed by each party on behalf of the child.

  (4)  The need for stability and continuity in the child's education, family life and community life.

  (5)  The availability of extended family.

  (6)  The child's sibling relationships.

  (7)  The well-reasoned preference of the child, based on the child's maturity and judgment.

  (8)  The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

  (9)  Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Mother argues that although the court properly determined that she should remain the primary caretaker, the court abused its discretion in ignoring evidence that would support "more time with Mother[.]" **See** Mother's Brief, at 19-20. Mother suggests "adjusting [her] primary custody from the 5 overnights Father has every 2 weeks, and the alternating weeks in the summer." **Id.** at 20. We find no support for this argument, and we find no abuse of discretion in the court's conclusion that there were no compelling reasons to alter the custody order.

We have reviewed the custody hearings from April 16, 2015 to December 27, 2016, the January 10, 2017 Statement on the Record, wherein the court reviewed all of the evidence received, and, finally, the court's

painstaking analysis of the statutory custody factors in both its January 10, 2017 Statement on the Record and its May 31, 2017 Rule 1925(a) opinion. Contrary to Mother's claim, the court considered all the evidence, including minor daughter's preference and her maturity in expressing that preference and Father's "abandonment." The court stated:

> [Minor daughter] tells me she likes school. She does rather well. She's involved in a jazz dance club. She's a cross-country runner. She has great grades in math and science. All these things bode well for her remaining with [Mother]. She is a straight-A, high honor roll student. And after we go through the background of this child, she states, without any prompting, she looked right at me – and I wrote it down – she said, "I've been living through this for nine-and-a-half years." . . . Her preference is strong to be with her mother for all the reasons she mentioned. All the reasons we accept. She's an incredibly bright, articulate child, not just academically, but poised, and her preference is well-reasoned and grounded in reality.

Trial Court's Statement on the Record, 1/10/17, at 54-55, 58. The court also considered what Mother described as "Father's abandonment," when he only saw Children once in a two-month period in 2014 and his failure to tell Mother the address of his new home. The trial court considered the events leading up to this. Mother, however, would have the trial court, and this Court, ignore the evidence presented by Father as well as the tortured history of this case.

Mother was continually late for her drop-offs at Father's home, and, ironically, it was Mother who would call the State Police when she was late for drop-off at Father's home, and police would escort Children from her car to Father. Mother contacted Children and Youth Services several times, alleging child abuse, once when Father took minor son to the emergency room for an

allergic reaction to ibuprofen. The court characterized Mother's actions as a

"studied attempt to make Father's life miserable." *Id.* at 12.

> I also heard that Father – and rightfully so- was very upset, as he should be, that Children & Youth had contacted him on numerous occasions. . . . Children & Youth are a last resort. They deal with horrific acts; sexual abuse, physical abuse, neglect. . . . Father legitimately mentions that [minor son] had an allergic reaction to generic ibuprofen . . . [s]o he took the child to the hospital emergency room. As a parent one would be concerned if a child had a reaction to any medicine, prescribed or over-the-counter. Mother called the police and alleged there was abuse by Father.

> * * * *

> Later, Father moves, but he doesn't tell Mother he moves. . . . What's Father's reason? He didn't want the police to come to his new home. April of 2014; Father didn't see [Children]. In May, he didn't see them until Memorial Day. You get into June. He only saw them on Father's Day. Father was spooked. I don't blame him. He said he didn't want Children & Youth or the police involved. . . . Mother admitted that four years ago she called Children & Youth. She alleged abuse by Father, which never happened. Father makes a mistake. I understand his anger.

*Id.* at 22-24.

In reaching its custody decision, the court considered the fact that

Mother exposed Children to the police and Children and Youth, used bad

judgment, and instigated turmoil. Despite this, the court found that Mother

"is, apparently, capable of taking care of the children." *Id.* at 46. The court

also considered the fact that Father made his share of mistakes and

contributed, wholeheartedly, to the continual discord between the parties. *Id.*

at 46-47. Mother's argument goes on to recite the evidence presented to the

court that she believes supports an order that is in Children's best interests, in other words, provides less time with Father.

Father responds that Children "are not doing well under [Mother's] primary care," as illustrated by their behavioral and emotional issues, and, therefore, the court's order maintaining the current custody schedule is not supported by the record. Father's Brief, at 21-22. There was considerable testimony regarding minor son's behavioral issues, minor daughter's recent "contemplation of suicide," and mental health counseling for Children. We are not convinced, however, that altering the custody order would alleviate Children's emotional issues; we agree with the trial court's assessment that Children's behavioral and emotional issues are more a consequence of their parents' dysfunction than the custody schedule.

Next, Mother argues that the court exhibited bias against her and that as a result of that bias, it did not fairly apply the statutory factors. These claims are meritless. Notably, the court was equally critical of the parties' behavior. Further, as we stated above, the court properly applied the statutory custody factors, both from the bench and in its opinion. Mother essentially seeks a reweighing of the evidence in order to a reach an even more favorable order. Father, in his cross appeal, seeks the same thing. Since the parties are unwilling to work out a custody schedule on their own, they are subject to the court's determination of what is in their children's best interests. We must defer to the trial court on issues of credibility and weight of the evidence, and our review of the certified record confirms the court's

conclusions drawn from its consideration of the statutory best-interest factors. We see no reason to disturb the court's custody decision based upon either party's assessment of the evidence. *Ketterer*, *supra*. We find no error or abuse of discretion. *Collins*, *supra*; *J.R.M.*, *supra*.

With respect to Father's cross-appeal, we rely upon Judge Rubenstein's opinion to dispose of his claims. Judge Rubenstein had the opportunity to observe the proceedings, over several years, and to make determinations concerning the credibility and demeanor of the witnesses, including the minor daughter, who Mother called as a witness. We defer to his findings. Further, Judge Rubenstein performed a careful and detailed analysis of the Children's best interests, and the evidence presented at trial supports the trial court's determination that their best interests are served by maintaining the current custody schedule. *See* Trial Court Opinion, 3/22/17, at 15-21. Accordingly, we affirm the February 22, 2017 order based upon Judge Rubenstein's opinion, and we direct the parties to attach a copy of that opinion in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/20/2017

- 12 -

IN THE COURT OF COMMON PLEAS
BUCKS COUNTY, PENNSYLVANIA
FAMILY DIVISION

G.      I.                                 :           No. A06-07-62331-C

        v.                                 :           CUSTODY

C.      S.                                 :           CHILDREN'S FAST TRACK
                                           :           APPEAL
                                           :

## OPINION

**"The Master tried in vain to assist these people. They are apparently completely incapable of co-parenting or working together [...] One thing is certain. They are not capable of working things out together so they need detailed instructions in their custody orders. Since their youngest child is age 3, they have only 15 years left to fight and litigate custody and they appear not to want to be cheated out of that opportunity."**

This conclusion was reached over eight (8) years ago by the Conference Officer who presided over the initial Custody Conference in I____ v. I____ held on **December 2, 2008.**

This conclusion was especially illuminating and prescient.

This is a "high-conflict," extraordinarily acrimonious case. The prolonged litigation between the parties began nearly a decade ago. Since then, there have been **413 separate domestic relations filings; 218 of these filings pertain solely to issues of custody.**

Since 2007, four (4) judges in the Bucks County Court of Common Pleas have presided over some aspect of this ongoing, seemingly endless custody litigation.

This appeal has been designated as a "Children's Fast Track Appeal."

G____ I____ ("Pro Se Father") appeals from this Court's Order of January 10, 2017, denying his Petition to Modify Custody and his Petition for Contempt.

127

In our Order of January 10, 2017, we directed that the parties share legal custody of the two (2) minor children: A: ┄┄┄ (D.O.B. May ┄, 2003) and A ┄┄ ┄ (D.O.B. November ┄, 2005). We also directed that C: ┄ S┄ ┄┄ ("Pro Se Mother") shall have primary physical custody and Father shall have partial physical custody, with custody alternating between Thursday afternoon until Monday morning, and Thursday at 4:00 p.m. until Friday morning in alternate weeks. Mother was also ordered to solely transport the children to and from all custody exchanges in a timely manner.

On July 26, 2007, Father filed a Petition for Custody incorporated into his Complaint in Divorce for custody of the parties' two (2) minor children.

On October 18, 2007, Mother and Father entered into an Agreed Interim Custody Order before the Honorable John J. Rufe. The parties agreed to share legal custody, with Mother having primary physical custody and Father having partial physical custody. Father's period of custody would alternate weekly between Thursday at 3:00 p.m. until Monday at 9:00 a.m. and Wednesday at 3:00 p.m. until Thursday at 9:00 a.m. The parties also agreed to undergo a custody evaluation.

On February 26, 2008, Father filed his **first** Petition for Contempt.

On July 9, 2008, Father filed his **second** Petition for Contempt.

On September 9, 2008, another Custody Order was entered by the Honorable John J. Rufe, awarding primary physical custody to Mother and partial physical custody to Father. Father was awarded custody from Thursday afternoon until Monday morning and Thursday at 4:00 p.m. until Friday morning on alternating weeks.

On September 19, 2008, Father filed an appeal to the Superior Court of Pennsylvania which he discontinued on January 6, 2009 [G┄┄ Ic┄┄ v. C┄┄ S┄ ┄┄ I┄ ┄, 2559 EDA 2008].

On September 25, 2008, a further hearing was held. Both Mother and Father's Petitions for Contempt were denied.

On October 27, 2008, Father filed his **third** Petition for Contempt. The following day, on October 28, 2008, Father filed his **fourth** Petition for Contempt.

2

On November 12, 2008, Father then filed a Petition for Special Relief and his fifth Petition for Contempt.

On January 6, 2009, a hearing was held before the Honorable Wallace H. Bateman, who ordered that Mother was responsible for all pick-ups and drop-offs of the children.

On June 12, 2009, Father filed a Petition to Modify Custody.

On July 21, 2009, Mother filed a "Petition for Emergency Relief" and a Petition for Contempt.

On September 14, 2009, this Court ordered that a Parent-Coordinator be appointed to attempt to mediate this continuing dispute. On October 13, 2010, the Parent-Coordinator sent an e-mail to both Mother and Father which read, in part:

> Normally I would send you this decision and not provide commentary, but in this case some commentary is necessary. It is sad. Your child is in need of professional help. This help should be swift, consistent and [sic] quality. Instead, we have delayed and fought over small items...Also, we have spent more money on me than it would to pay for therapy sessions for your son. Stop focusing on your dislike of one another and instead focus on your son and your daughter. **If you two cannot find middle ground, then I anticipate that you will have other people making important decisions about your lives and the lives of your children for years to come.** [emphasis added].

Following this e-mail, Father filed a "grievance" against the Parent-Coordinator.

On March 24, 2010, Father filed his sixth Petition for Contempt.

On October 19, 2010, Mother filed another "Emergency Petition to Modify Custody."

The bitterness and hostility between Mother and Father was so palpable, that on January 4, 2011, over six (6) years ago, the Honorable Wallace H. Bateman was compelled to enter an Order requiring Mother and Father to, at the very least, "be civil" to each other. See I____ v. S_____, 2007-62331-C, Docket Entry #123.

,

3

On January 14, 2011, the previous Custody Order was again addressed by the Honorable Wallace H. Bateman. The summer schedule was modified, granting Mother and Father alternating weeks of physical custody. All other provisions of the September 9, 2008 Order remained in effect.

On March 6, 2013, Mother filed yet another Petition to Modify Custody and requested that therapy and counseling be ordered for their son, A'      .

On August 16, 2013, a hearing was held before the Honorable Diane E. Gibbons, who denied Mother's Petition to Modify Custody, as well as Mother's request for therapy and counseling for A'      .

On December 24, 2014, Mother filed another Petition to Modify Custody.

On January 28, 2015, Father filed his seventh *pro se* Petition for Contempt. He then filed his own Petition to Modify Custody on February 2, 2015.

The following day, on February 3, 2015, yet another Custody Conference was held, where the Custody Conference Officer noted the obvious: that the "parties are continuing to have communication issues."

On April 16, 2015, it was ordered that the parties participate in an evaluation with the Court Conciliation and Evaluation Service.

At a previous hearing, the Honorable Wallace H. Bateman stressed the importance of timeliness regarding transporting the children to and from custody exchanges.

On July 20, 2015, a hearing was held after Father complained that Mother was habitually late in transporting the children and had continually summoned the Pennsylvania State Police to appear at custody exchanges at a previously agreed drop-off point between their respective homes. Mother was eventually found in willful contempt of the previous Custody Order. Father was awarded temporary sole legal and physical custody of the children for thirty (30) days. After that period, the previous Custody Order would be reinstated.

4

In finding Mother in contempt on July 20, 2015, we noted:

So what have we heard over two days of many hours of testimony? Well, Mr. I( ....says that mother is chronically late for drop offs – 6:10, 6:05, 6:18. That's not egregious, but 6 o'clock means 6'o clock. If you can't deliver the children in a timely fashion, Miss S｀ · ｀., you arrange for someone who can. It's not fair to Mr. I(ᐨ .. It's not fair to thë children. They know, because you've told them, that they have to be at their dad's by 6 o'clock. They can tell time.

August 29th, less than a year ago...there was testimony that Mother was 45 minutes late. I understand traffic. I understand congestion. I understand detours. I understand being late from work. I'm not understanding 45 minutes late.

To compound the issue...it's Mother who called the police. There's a great irony here. Mother is late, and she is the one who calls the police. And the testimony is that she wouldn't allow A. . ,· to leave the car. It's believable. There's a pattern here.

[...]

I asked you, Miss S' ‿ ·, what did you expect the police to do? Did you expect them to drag A. ·¿· · ¨·¯ out of the car and put him in handcuffs or perhaps put Mr. I·ᐧᐧ¿ in handcuffs? The police do not have that function. Instead, they apparently walked A. ᐧ ᐧ ᐧ ¿ to Father's arms. This sends a terrible message to any child.

What's the message? Mon and Dad cannot get along. They can't even perform in a timely fashion. When things get dicey, rather than discuss this, rather than talk about it, we use the last resort as the first resort.

[...]

October of 2014. Mother is more than late. She just does not drop the children off. On October 30, 2014, Father has a visit with the children. The Father...said...he just wanted to see his kids.

Mother has a different mission. She wants to complicate these visitations. I'm not saying that Father is blameless. No. Neither parents has covered themselves with glory in any of these events.

[...]

With regard to A⸱⸱⸱ ·‿ · ·: not getting out of the car, this is poor parenting, because you're the parents who's raising the child. You say to him, A⸱ .‿ ·¯‿ ·, you have to see your Father. Not, you may see your Father, you could see your Father. This is the time to see your dad. So he refuses to get out of the car and he is empowered and you have enabled that empowerment.

5

Notes of Testimony, July 20, 2015, 4-7.

A bad message to the children is that they should somehow be afraid of M'       ⸺
[I⸺⸺], or, unless dad is there, that [Mother] won't drop them off. It's not like you
were dropping them off to a child molester or a known felon. It's the children's
stepmother.

Notes of Testimony, July 20, 2015, 15-16.

In August of 2014, Mother was 45 minutes late for a custody exchange.

We stated:

> Now, one would think that there is an explanation for why she was late...I
> understand traffic. I understand. I understand demands of employment. Not
> everybody can be on time. But what I also understood – which is apparent and
> palpable – is this was a part of Mother's studied attempt to make Father's life
> miserable.

> It was intentional, willful conduct. And despite the fact that other Judges said 6
> o'clock means 6 o'clock, Ms. S⸺  ⸺ totally ignored that. It was mean-spirited. It
> was willful. And it upset Mr. I⸺ ⸺. But most importantly, it upset the children.
> They knew that 6 o'clock was the target date; that it was inviolate. They can tell
> time, and they know that Mother has an obligation to them and to the Court to obey
> an Order.

> What happens? The testimony indicates that the police are called. If I had to posit
> this scenario to someone who was separate from this episode, they would say, I
> guess Father called the police. No, it was Mother who called the police. She would
> not allow A⸺     ⸺ to leave the car. The State Police arrived and they walked
> A⸺ ⸺ ⸺ ⸺ over to Father.

Notes of Testimony, January 10, 2017, 12-13.

Mr. I⸺ ⸺ and Ms. S⸺ ⸺ ⸺ mention incessantly the names John Rufe and Wallace
Bateman, two Judges of this court. In 2008 John Rufe enters an Order. It's wholly
ignored by both. In January 2011 Judge Bateman modifies the Order. He gives
firm warning to Ms. S⸺   ⸺ that her lateness is intolerable, and she ignores him.
Now they say, in retrospect, Judge Rufe said this. Judge Bateman said this.

So now we get to the parties having agreed to CCES as part of a Court Order. And
again, we hear the ugly specter of Children & Youth investigations, all of which
were unfounded. These are false allegations. Mother calls Children & Youth
incessantly. She doesn't care what that means to the children. She is just going to
get her pound of flesh out of [Father].

6

132

It was interesting, too, that Mother calls Children & Youth right around Christmastime. What happens prior to that? The new Mrs. Ir̶⁓⁓‿ connects with Mr. Ic⁓⁓ .

The timing is wonderful. Despite (Judge) John Rufe, despite (Judge) Wallace Bateman, we have an August of 2014 visit; this incredible incident where Mother drops the children off at 6:40 p.m.

She's 40 minutes late. Unless there is an earthquake on 309, it's unacceptable. And again, we see the sorry spectacle. A⁓ ⁓⁓‿ is locked in the car, and Mother, who is late, calls the State Police and they walk him over to Father. It's a great message you sent to this little boy.

Then a few months later, again showing Mother's absolute contempt for Father and her own children, brings the children for a drop-off at Father's prior home, but she wouldn't allow the children to get out of the car.

Notes of Testimony, January 10, 2017, 20-22.

We are now into June of 2016. We're into the ninth year and there's a complaint again. Going back two years before, the Mother was to arrive at 6:00. She arrived at 6:40. That despite her own lateness, she calls the Father; that she was calling the police because she was late.

And surprise. When the police came to Father's home and escorted A⁓ ⁓⁓ into Father's house, the child was crying and sobbing. Well, A⁓‿⁓⁓ ⁓⁓ ⁓, it's time to see your dad, but first we have to call the State Police to have you walk up to his home. You wonder why these kids are troubled.

Notes of Testimony, January 10, 2017, 35-36.

Judge Bateman, who also doesn't want to have his fingerprints in this file ever again, is exasperated, and he says in January of '09, seven years ago, all right, 6 o'clock p.m. drop-off time. Mother refused to abide by the Order. The first chance she gets she shows up 45 minutes late and won't drop the children off for the reasons I stated.

Notes of Testimony, January 10, 2017, 62.

Father played a voice mail in December of '13. Mother wants to insure that the children are safe, as if Father is somehow dangerous to the well-being of his own children. February of 2014 explains to a great degree Mother's mean spirit. She leaves a voice mail for Father. She knows she has to drop off their children, but she doesn't. Why? Because M⁓ ⁓·⁓⁓ (Ic⁓ ⁓ ) was there.

7

So in her mind she said, I am required to drop the children off to the Father, but he's not there, so that means I don't have to drop them off to M. . . [I( .]. So Mother does something wholly contrary to what's in her children's best interests. She just takes off.

Notes of Testimony, January 10, 2017, 25.

And after this occurs, just a matter of a few months ago, the most damning piece of evidence is this: Mother – and she is calm, she is not cursing, using any invective, or any personal argument – she is very calmly leaving the voicemail that says...Mi . .. [Father's new wife] was there, but obviously you're [Father] not there, and you're not available for custody, so I'm taking off.

[...]

We find as a fact that Mother has willfully and deliberately denied Father periods of custody to which he was entitled. I'm not talking about 6 o'clock. I'm talking about calling the police and leaving, because M. ... [Father's new wife] was there. That is unconscionable.

It is not Father's time with the children. It is not Mother's time with the children. People get it all wrong. They say it's my time, it's her time, [and] it's his time. It's their time. They have been denied that time.

[...]

So we are going to find Mother in contempt. She has deliberately engaged in a pattern of denying court-ordered custody to the Father.

[...] Effective immediately, Father shall have the next 30 days of sole custody with the children. Mother shall have a right to one telephone call every Saturday at 12 o'clock noon of ten minutes each with the children.

Notes of Testimony, July 20, 2015, 15, 17-18.

On August 5, 2015, Mother filed a Motion for Reconsideration of our Order of July 20, 2015, which was denied on August 27, 2015.

On August 10, 2016, Father filed yet another Petition to Modify Custody.

On October 7, 2016, Father filed a *pro se* "Motion for Prompt Disposition Pursuant to 231 Pa. Code Rule 1915.4(c) and Hearings on Consecutive Days in Custody."

8

To date, a total of twenty-one (21) hearings have been held on the following dates: October 10, 2007, May 22, 2008, August 12, 2008, September 25, 2008, January 6, 2009, September 3, 2009, July 12, 2010, October 27, 2010, December 17, 2010, January 4, 2011, August 16, 2013, April 16, 2015, July 20, 2015, December 22, 2015, February 29, 2016, April 18, 2016, June 16, 2016, September 23, 2016, December 12, 2016, December 27, 2016, and most recently, January 10, 2017.

Due to the voluminous nature of the filings in this case, we will highlight only the more troubling and self-defeating actions elicited from the most recent testimony. We also note that Father, in the most recent hearings never testified. Instead he called his new wife (M: '_.'. I( ) as a witness in this case and asked her to relate certain "facts" and observations on his behalf.

Both Mother and Father proceeded in this round of hearings *pro se*. As *pro se* litigants, they were seemingly unconcerned with the Rules of Evidence which govern these proceedings. They also ignored issues of relevance in eliciting from each other descriptions of remote events which were previously and thoroughly litigated and which        iearing upon the present custody circumstances or the best interests of their children.

Hearing of April 16, 2015:

- Father testified that, on August 29, 2014, Mother was 45 minutes late dropping off the children for Father's custodial time. When Mother finally arrived, she refused to allow A.   · to leave her, and only did so after calling the Pennsylvania State Police to "walk" A!    to Father's car.
- On February 6, 2014, A.   · exited Mother's vehicle and performed a "nasty dance" towards Father, and then re-entered Mother's vehicle. Mother promptly left with the children.
- Bucks County Children and Youth made five (5) visits to Father's residence based upon Mother's unfounded allegations of abuse.
- After A: ·; −·. . had an allergic reaction to generic Ibuprofen and was taken to the hospital by Father. Mother alleged that Father physically abused the child.
- Father declined to exercise custody for four (4) weeks in the Summer of 2014.
- Father refuses to accept e-mails, text messages, and certified mail from Mother.

9

- A⸱ ⸱ ⸱ began to exhibit behavioral issues, including Attention Deficit Hyperactivity Disorder, and had been expelled from one daycare facility. Father refused to agree to behavioral counseling for A⸱ ⸱ ⸱ .

**Hearing of July 20, 2015:**

- Mother called Children and Youth "eleven or twelve times," notably around the holidays, after Father's new wife, M⸱ ⸱ ⸱ I⸱ ⸱, moved into his residence.
- In January 2015, Mother did not allow the children to exit her vehicle at Father's residence, and instead drove them to a Red Robin restaurant nearly thirty minutes from Father's home.
- In March 2014, Father met with the children's school principal, as well as local police officers, after the children allegedly said they felt "unsafe" in his custody.
- Father did not exercise custody for various times in 2014 out of fear that police, Children and Youth, or school administrators would be contacted by Mother.
- Mother was contacted by Lehigh Valley Children and Youth her county of residence, three (3) times, although Father and his new wife (M⸱ ⸱ ⸱ I⸱ ⸱) denied contacting that agency.
- Mother alleged that, in March 2014, Father told the children that he "would never see them again."
- A⸱ ⸱ ⸱, despite being twelve (12) years old, was still wetting the bed. It was suggested in the Custody Evaluation that this may have been caused by the anxiety of the ongoing litigation between her parents.
- Mother left a voicemail for Father, admitting that she saw M⸱ ⸱ ⸱ I⸱ ⸱ at Father's residence, but left with the children since he was "not available for custody."

**Hearing of December 22, 2015:**

- A⸱ ⸱ ⸱ missed dance recitals because Father did not transport the children to their extracurricular activities as it was "on his time."
- Mother complained that Father shared the contents of the Custody Conference Report with the children's pediatrician.

10

136

- Father, upset by the conclusions of the Parent-Coordinator, filed a formal grievance against the coordinating attorney.
- M⸱ ⸱⸱ I accused Mother of neglecting the children by dressing them in ill-fitting clothes and not providing them with winter coats.

Hearing of February 29, 2016:

- M⸱ ⸱ I ⸱ accused the children of being "dishonest."
- Mi ⸱ ⸱ I accused Mother of causing "conflict and chaos" and engaging in "brainwashing" of the children.
- M⸱ ⸱ I⸱⸱ alleged that A⸱ ⸱ ⸱⸱ has been expelled from a second daycare facility due to "bad behavior" while in Mother's custody.
- Father informed the children's pediatrician that Mother is bipolar, despite no such formal diagnosis.
- When A⸱ ⸱⸱ ⸱⸱ attempted to contact Father, he discovered that Father blocked his telephone number.

Hearing of April 18, 2016:

- M⸱ ⸱⸱ I⸱ ⸱ admitted that she obtained a copy of the report of the Custody Evaluation, despite clear language on the cover of the Evaluation stating that "CCES policy prohibits parties from obtaining a copy of this report because of the sensitive information it may contain." She then marked and annotated that report with comments for use at the upcoming hearings.
- M⸱ ⸱⸱ I⸱ ⸱ also admitted videotaping A⸱ ⸱ , when he misbehaves, apparently, in an effort to prove Mother is an inadequate parent.

Hearing of June 16, 2016:

- Both parents admitted to video-recording custody exchanges at various times.
- Father discovered that A⸱ ⸱ ⸱ used her cellphone to send a "bikini picture" to a classmate while in Mother's custody.
- As of early 2016, A⸱ ⸱ was considering suicide, but Mother did not inform Father until June 2, 2016. Mother suggested that A⸱ ⸱ ⸱⸱ immediately receive

11

counseling. **Father, however, in response to these suicidal expressions, instead requested an immediate hearing before this Court.**

Hearing of September 23, 2016:

- Mother and Father continually criticize ("bad-mouth") each other.
- Both children have already received mental health treatment, and A‾ ⁙ ⹁ was receiving psychotherapy treatment.
- A₁ ⸱⸱⸱ ⸱ continued to have behavioral problems at school.

Hearing of December 12, 2016:

- M⸴ ⹁ I ⸱ ⸱ admitted to writing, but denied sending, a letter to Lehigh County Children and Youth, alleging that there is dog feces in Mother's home and that the children have "rashes and warts." There was no evidence that either claim was true.

Hearing of December 27, 2016

- Mother and Father debated an orthodontics bill from over two (2) years ago.
- Mother insisted that A⸱ ⸱⸴ ⸱ testify, despite this Court cautioning the parties of the potential emotional trauma to A⸱ ⸱⸱ ⸱⸱ by calling her as witness.
- A⸿⸴ ⸱ ⹁ testified that her Mother is her "best friend" and although Mother does not "bad mouth" Father in front of the children, Father continually insults Mother. A⸱ ⸱⸱ ⸴⸴⸴ ⸱ also noted that Mother encourages her to maintain a relationship with her Father.
- M⸱⸴ ⹁⸴ I⸱ ⸴⸴ repeatedly remarked to A⸱⸴ ⸱ ⸴⸱ that her Mother "belongs in an institution" and continually accused the children of "lying."
- A₁ ⸱⸴⸱⸱ ⸴ alleged that M⸱⸴ ⸱⸴⸴⸴ I⸴ ⸴⸴ frequently yells at her and A⸱ ⸱⸴ ⸴⸱ , and that Father once threw A⸱ ⸱ ⸴ into the shower while fully clothed.
- Father and Michelle Iosue referred to A⸴ ⸴⸴ ⸴⸴ 's school mascot, the "Parkland Trojans," as the "Parkland Condoms," which upset A ⸱⸱ ⸴ ⸱⸴ ⸴⸴.
- **Father, disappointed with the nature of A⸴ ⸴⸴ ⸴⸱ 's testimony, requested that the Court read aloud to her the definition and penalties for perjury.**

12

We were particularly troubled by both 1) Father requesting a reading of the perjury statute to his daughter while testifying and 2) Father requesting immediate hearings rather than seeking psychotherapy or counseling for A ⸱ ⸱ ⸱'s suicidal ideations. We remarked:

> I've never seen this ever happen before in all my years of doing this. I've never had a Father in the middle of a testimonial statement by his child, say to the Judge, "Your Honor, I wish you to read the perjury statute to my daughter," like we're going to do that.

> All right. Okay, A ⸱ ⸱. Perjury is a felony of the third degree. Whoever willfully swears under oath, knowing the statement to be false is subject to a sentence of imprisonment of up to seven years and a $15,000 fine.

> Does that make you happy now, Mr. I( ⸱? That your daughter understands that you're alleging she's committed perjury? And now she knows she can go to prison for up to seven years. That really brings the family together and really creates a great bond between yourself and your daughter.

> You can't make this up. Father asked the Court to read the perjury statute to a child. She didn't lie. She told the truth, except the truth is not helpful to Mr. I ⸱ ⸱ ⸱. So when the child says something contrary to what he wishes, he calls her a liar.

> He doesn't step back and say that maybe there's some truth to what she says. Maybe she's not happy in this situation. Maybe there's something I'm doing wrong. Maybe it's something Mother's doing wrong. No, he wants to have the perjury statute recited.

> Another thing that's almost incomprehensible is this. Father filed a Motion for a recent hearing. And, of course, we review the Motions and we read them before setting up the hearing date. So this Motion was filed most recently, October 2016, and it's entitled: "Plaintiff's Motion for Prompt Disposition and Hearings on Consecutive Days in Custody filed by Father."

> So, one would think, while I understand how this is important to the parties ... why is there a prompt disposition required? The history is it's now ten years they're in this dispute. So it catches our attention.

> Mr. I( ⸱⸱ wants consecutive days of custody hearings, and we accommodate him. The very first statement in his Motion is as follows, and I'll read it: **"the parties' minor child, A ⸱ ⸱ ⸱ C⸱ ⸱ ⸱ I( ⸱ , has expressed suicidal thoughts, and it is for that reason that Father needs a prompt hearing."**

Notes of Testimony, December 27, 2016, 30-32.

We continued:

What else did I hear from M‎ ‎.‎ ‎? It's not enough that the parties and the new, loving wife have to implicate these innocent children. We hear about [A‎ ‎.‎ ‎'s classmate]. He's a classmate. M‎ ‎.‎ ‎ is up in arms, as is Father, that A‎ ‎.‎ ‎ sent a, quote, "bikini picture" to this guy, and somehow that indicates that the Mother is an unfit parent.

[...]

M‎ ‎.‎ ‎ is convinced that the only reason A‎ ‎.‎ ‎ expresses suicidal thoughts is because of Mother and no one else; that if somehow A‎ ‎.‎ ‎ would live in the happy home of the Iosues with their two new children, the world would be a better place and A‎ ‎.‎ ‎ would be fine. No doubts, no questions, no issues of self-harm.

Notes of Testimony, December 27, 2016, 36, 41-42.

In issuing our Order, we noted:

This case began in 2007. It has reached its tenth anniversary. It has been acrimonious, contested on every level, and it seemingly does not end. Everything that has occurred until this day has been predictable.

Notes of Testimony, January 10, 2017, 3.

Now, having sat on this case for a lengthy period of time, I am absolutely convinced as I sit here today that after I render a decision it will have no real effect upon Mother and Father. One of them, or perhaps both, will be disappointed and will agonize over the fact that I haven't quite accomplished their goals. And I would expect that in the future we will see Ms. S‎ ‎.‎ ‎ and Mr. I‎ ‎.‎ ‎ again.

And what you have in store for your future is you will both take off from work. You will be sitting down at your computer, feverishly typing findings of fact that I should accept. Filing either with new counsel or pro se ... various motions alleging the evil nature of the other. And cast off into the background are A‎ ‎.‎ ‎ and A‎ ‎.‎ ‎.

Why do I predict doom for these parties? It's not an intuitive feeling. It's not a matter that I've conjured up. It's grounded in reality.

Notes of Testimony, January 10, 2017, 9-10.

So the message isn't being delivered. And if it is, it just passes through without a second thought. So it falls upon me to make some sense out of senseless litigation.

Remember, again, that it doesn't make a difference if I like or dislike Mr. I᠁ or Ms. S᠁. That is not a part of this equation. It's all about your children.

Notes of Testimony, January 20, 2017, 11.

In addressing the statutory custody factors, we stated:

We will review certain of the mandated factors which apply to the statutory factors which we must address in accordance with the dictates of the Supreme Court of Pennsylvania. Which party is more likely to insure the health and safety of the child? Both are capable. Neither party, Mother nor Father, is a threat to the safety, the physical well-being of either child.

Which party is more likely to encourage and permit frequent and continuing contact between the child and the other party? Probably neither. Although, it's somewhat equal footing, but we believe Mother, despite her occasional madness, is likely to encourage the frequent contact, as long as it's on her terms. But now it will be on our terms.

Despite the finger-pointing throughout, there's no abuse committed by either party or any member of the parties' household; not by Mi᠁ Ir᠁, not by Mother, not by Father. There's no danger to the physical safety of any of these children.

Each parent, Mother and Father, is certainly capable of performing duties on behalf of the children needed for their stability and continuity and their education, family life and community life. Both parties have extended family. The children have sibling relationships, not only with each other, but on a positive note, with the new children of the Iosue union.

I don't know what A᠁r would say; he didn't testify, but I read his recitation to Dr. Brooks (the Custody Evaluator). Clearly, A᠁ has a well-reasoned preference, grounded in reality. As I said, she's bright, articulate, thoughtful. She is mature. Her judgment is sound. Her preference is, as we stated, with Mother.

Has there been an attempt to turn the child against the other parent? Yes. It is witnessed by the fact that both children are told their mother belongs in a mental hospital. But Mother gives as good as she gets. She doesn't necessarily say that to the child, but her actions show her utter contempt for Father. But in some sense they both turn the children against the other parent.

Who can maintain a strong, loving, stable relationship, nurturing for the children? Both parents can, except for most of the lives of the children, Mother, despite her failings, has been the primary custodian. Both parties are equally capable of tending to the physical, emotional development of the children. Blessedly, there are no special needs, physical or otherwise.

15

Proximity of the residence of the parties. Problematic. Problematic because of Mother. She's the one who chose to separate as far as she can logically separate from Father's home. Therefore, it falls upon her, since she created the situation, to do all pick-ups and drop-offs.

Each party has the appropriate ability to make alternative, appropriate childcare arrangements, if necessary.

What is the level of conflict between the parties? It's extraordinary. This is a pitched battle. It's a war without end.

What is the willingness of the parties and the ability of the parties to cooperate? Well, they're certainly smart. Both G. ⸱⸱⸱ and C: ⸱⸱ are especially bright. So they have the ability to do it. They just won't. So the ability is there intellectually, but the willingness is not. Nothing I say today will change that.

There's no history of drug abuse or alcohol abuse by either party. Despite Father's protestations that Mother is nuts, it only happens on occasion. There's no mental infirmity by either. There have been rampant allegations of abuse. None of them have any context in reality.

Notes of Testimony, January 10, 2017, 65-69.


On February 8, 2017, Father filed his appeal. Father raises the following four (4) issues, *verbatim*:

1. Should this Court vacate the lower court's final custody order because it was based on unreasonable conclusions relative to the Children's need for stability, and therefore does not further the best interest of the Children, because:
    a. The court's most important conclusion relative to Children of sound judgment to provide a well-reasoned preference was not supported by any evidence and was thus not a sustainable finding (Children contemplating suicide and expelled from two daycares with continual behavioral problems);
    b. The court's order was unreasonable because it failed to address the fact that the Children are deprived of Father's care for extended periods during the school week due to Mother's created impediment with respect to proximity between homes, and which is particularly problematic in light of the court's simultaneous conclusion that Mother discourages the Children's relationship with their Father and instigates turmoil?
2. The trial court abused its discretion and/or committed an error of law by violating the 14th Amendment of the Constitution of the United States in denying a pro-se party from obtaining a copy of the custody evaluation report in upholding a discriminatory policy that only allows lawyers to obtain copies.

16

3. The trial court abused its discretion and/or committed an error of law in failing to recognize Father's Petition for Special Relief filed on August 10, 2016, which was added to the docket and scheduled for trial on September 23, 2016 at the same time as the custody modification, and which evidence obtained within contradicts the findings in the lower court's opinion.
4. The trial court abused its discretion and/or committed an error of law by not adhering to the Rules of Civil Procedure in not promptly disposing of the custody matter.

"Statement: Issues to be Raised on Appeal," February 8, 2017.

Father's first contention is that we, as a general matter, failed to adequately assess the children's best interests. It is well-established that judges are granted broad discretion in custody matters. The Superior Court of Pennsylvania has held that:

"In reviewing a custody order, our scope is of the broadest type and our standard is [an] abuse of discretion...Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court."

*M.O. v. J.T.R.*, 85 A.3d, 1058, 1061 (Pa. Super. 2014) (*citing* V.B. v. J.E.B., 55 A.3d 1193, 1197 (Pa. Super. 2012)).

When determining the children's best interests, Courts must analyze, on the record, sixteen (16) separate factors. Two of these factors are "the need for stability and continuity in the child's education, family life, and community life," and "the well-reasoned preference of the child, based on the child's maturity and judgment." 23 Pa.C.S.A. § 5328(a) – Factors to consider when awarding custody, (4), (7). We also note that it is within the Court's discretion to analyze and decide which of these sixteen factors is most relevant and significant in each case. *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (*appeal denied* 68 A.3d 909).

We also note that this Court, as the finder of fact in custody cases, is in the best position to determine the weight given to a child's preference. *Cardamone v. Elshoff* 659 A.26 575, 583 (Pa. Super. 1995).

Here, we clearly addressed these factors on the record based upon both the testimony of A ... ., as well as statements made by the children at the two (2) separate Custody Evaluations. We noted at the December 27, 2016 hearing:

17

143

A... seems to like her Father, but then she tells me something that I know; something that's apparent. This child, who's contemplating suicide, according to Mother and Father, complained bitterly that her stepmother and her Father constantly talk negatively about the Mother.

For better or for worse, A... ..., as a girl, identifies with her Mother. If you denigrate the Mother with whom she identifies, you denigrate the child. If the mother is worthless, the child, who is the spawn of the Mother, will also feel worthless. You don't think about that. You just do it.

And you complain, Mr. I... ..., why your daughter doesn't return your telephone calls. She says to the evaluator: because every time I do you criticize my Mother, and I want to avoid it. Now, is this one voice in the wilderness or is it confirmed?

Now, A. .. I'm sure he loves his Father, but he complains about Father's quote, "loving wife," Mi .. ... He complains about the stepmother. He says, as young children do, using his term, she's sometimes "mean" to him. I don't know if that's so, but he is very troubled, as his sister has said that she says negative things about his mother. And he is devastated that the Father decided to not see him for a period of some months.

Both children complain that Mr. I... doesn't support their activities; that he wasn't diligent in making sure that they went to whatever it was that had been scheduled. The home visit seemed to be more positive with Mother, and that may be so, but the positive ends when the drop-offs occur.

The evaluator, who has been doing this for years, says near his conclusions, quote, "Unfortunately, the ongoing hostility and conflict between the parties has done little other than to place the children in the midst of a conflict that is of no benefit to them."

But because he considers the best interests of the children, he says something even more telling. The children clearly identify more with their Mother's home. They both clearly stated that they liked their schools and didn't want to change schools.

And despite all of Mother's failings – and you could put them on parchment, on a scroll as if a Roman tribune were reading the declaration – [the Evaluator] says – and we agree – there does not appear to be a compelling reason to change them from a placement where they feel comfortable and appear to be well-adjusted.

We endorse that conclusion.

Notes of Testimony, December 26, 2017, 50-53.

Additionally, we note that A... ..., while often hesitant to visit her Father's residence for his periods of custody, testified that Mother promotes the relationship between her and Father. To

18

suggest that Mother, in Father's words, "discourages" the children from maintaining a relationship with Father is not at all supported by the record in this case.

Father alleges in this appeal that our Order of January 10, 2017 promotes instability for the children and that our findings were unreasonable. We disagree, and specifically find that our Order of January 10, 2017 will clearly promote stability in the children's lives. The evidence is unmistakable that the children prefer to live with Mother and continue attending the same school. Father refuses to accept this as a fact.

Father next contends that this Court violated his due process rights under the Fourteenth Amendment for not allowing him to obtain a copy of the Custody Evaluation, because it discriminates against *pro se* parties.

The first page of the Custody Evaluation of October 1, 2015 contains the following language:

> A copy of this report has been sent to ... the attorney for C· · ·? S\. ... : and to...the attorney for G\. _ I· · ·. The attorneys may wish to share this report with their clients in their offices. However, in order to protect confidentiality, they are **reminded that CCES policy prohibits the parties from obtaining a copy of this report because of the sensitive information it may contain.** Likewise, counsel should refrain from attaching this report as part of any other future pleading or proceeding. [emphasis added].

The most recent Custody Evaluation contains thirty-five (35) pages of confidential interviews from not only the parties and children, but extended family, a camp counselor, a therapist, a pediatrician, a school counselor, and a caseworker form Bucks County Children and Youth. It is patently obvious that this report contains incredibly sensitive information. For that reason, the Court Conciliation and Evaluation Services limits who can view or copy the Evaluation Report.

If the parties are represented by counsel, they are free to view the Evaluation at counsel's office. Yet, they are still forbidden from making personal copies of the Evaluation. If a party is self-represented, they are still entitled to view the Evaluation at the Family Master's Office at the Bucks County Justice Center, however, they are still not permitted to obtain a copy. Therefore, a party to a custody case has the same right to view, but not keep, the Evaluation regardless of

19

whether they are represented by counsel. Father has the same right to view the Evaluation as he had if he retained counsel.

Finally as to this issue, we feel compelled to restate that Father's wife somehow obtained a copy of the Evaluation in violation of CCES' and this Court's clear policy. Additionally, Mrs. M⋯ ⋯ I⋯⋯ annotated the Evaluation in order to make comments in open court for any subsequent hearing.

Father next argues that this Court abused its discretion in failing to consider "evidence" contained in his Petition to Modify Custody. It bears repeating that the Court is the sole finder of fact and determiner of credibility in custody cases. Father is attempting to act as the gatekeeper of the "evidence" he feels should be admitted and considered by the Court in his favor. However, our determination and Order was not made by whim or caprice. This decision was entered following a careful and thorough review of the testimony, exhibits, and records of the previous 21 hearings.

We also find Father's final contention to be wholly without merit. Father asserts that this Court committed an error of law in "not promptly disposing of the custody matter" pursuant to 23 Pa. Code 1915.4. -- Prompt Disposition of Custody Cases.

According to that rule, Courts are required to list a case for trial within 180 days of the filing of the pleading. The trial must commence within 90 days of the date the Order for Hearing is filed. Additionally, if the Court is unable to list the trial for consecutive days, the trial must conclude within 45 days of the first hearing.

Here, Father filed his Motion for Custody Hearing on September 23, 2016. On October 5, 2016, well within the requisite 180 days, this Court listed the case for hearings on December 12, 2016 and December 26, 2016, both well within the 90 day time period required by the rule. Finally, even though the cases were not listed on consecutive days, the case concluded within two weeks of the first hearing on his Petition.

While we certainly recognize Father's right to his day in court, as well as his interest in the custody of his children, we find it disingenuous to argue that we erred in failing to "promptly dispose" of the case. Despite Mother and Father's repeated assertions that they do not wish to

20

litigate, the 218 custody filings over the last decade strongly suggest otherwise. This prolonged litigation has been solely driven by Mother and Father's utter contempt for each other. It is our view that, until Mother and Father are able to set aside their mutual disdain and focus upon their children, this litigation will only continue, further jeopardizing the children's best interests.

For those reasons, we respectfully request that our Order of January 10, 2017, denying Father's Petition for Contempt and Petition to Modify Custody, be affirmed.

BY THE COURT:

_____
ALAN M. RUBENSTEIN, J.

_____
DATE

21